*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ELIZABETH A. CLINE,

       Plaintiff-Appellee,

UNPUBLISHED
March 28, 2024

v

No. 366653
Calhoun Circuit Court
LC No. 2021-003007-DM

MATTHEW E. CLINE,

       Defendant-Appellant.

Before: PATEL, P.J., and RICK and FEENEY, JJ.

PER CURIAM.

Defendant-appellant, Matthew E. Cline, appeals as of right the trial court's divorce judgment. Defendant raises several arguments on appeal: (1) the trial court erred by awarding temporary physical custody of the parties' child, DC, to plaintiff-appellee, Elizabeth A. Cline, without holding an evidentiary hearing; (2) the court erred by awarding plaintiff sole physical and legal custody of the child with limited parenting time to defendant; (3) the court failed to consider plaintiff's bonus income while calculating child support; (4) the court erroneously increased defendant's child support to include childcare costs without making any findings as to those costs; and (5) the court erred by denying defendant's request for interim spousal support. For the reasons explained in this opinion, we believe that defendant's assertions are without merit and affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

This case arises out of the parties' tumultuous divorce proceedings. As a background summary, the parties accumulated substantial debt during their 11-year marriage. The total marital debt at the time that the trial court issued its ruling related to the property division was $107,452.16. Plaintiff was the primary breadwinner for the family, while defendant accepted a worker's compensation settlement in 2015 and did not work again until after the divorce complaint was filed. Plaintiff also handled the parties' finances. The parties relocated several times during the marriage—they lived in Michigan, Georgia, and Missouri—as plaintiff pursued her career. The parties disputed who was the primary caretaker of young DC during the marriage.

In its temporary order motion, plaintiff moved for temporary physical custody; in response, defendant requested that the trial court award joint physical and legal custody to the parties with a

-1-

50/50 schedule, institute child support, deny the request for financial contributions toward the marital home, and award spousal support. After reading the extensive briefs and receiving both counsel's oral arguments at the hearing, the trial court ordered that an evidentiary hearing be held on the issues of custody, support. and parenting time. The court also entered orders regarding the parties' Baldwin property and defendant's request for spousal support.[1] The trial court further granted the parties joint legal custody and granted plaintiff primary physical custody in its temporary order. Defendant was given parenting time every other weekend and alternating holidays. Defendant could also have midweek parenting time on Wednesday, or another day if the parties agreed, from 4:00 p.m. to 8:00 p.m. After defendant obtained employment, the court granted plaintiff's request for temporary child support.

The trial court conducted the divorce trial over a period of eight days. In a detailed bench opinion, the trial court began by making the following findings on the record before addressing the bulk of the parties' arguments and its findings:

> Before I get into the specifics as it relates to the issues before the Court, I wanna state that the credibility is always an issue in a case, and often, a party will allege that the other party or a witness is untruthful in their testimony. The Court has often found that a party's testimony is affected by their background, perception, bias, understanding or misunderstanding, and it's not the result of intentional untruthfulness. To assess credibility, the Court looks to the testimony of other witnesses or other evidence to arrive at an objective understanding of the evidence. The Court has made such an assessment in this case because there was inconsistent and contradictory evidence presented. The Court was—I will state the Court was troubled by the Defendant's testimony. Often time, he appeared to be evasive, he would parse words, he [feigned] misunderstanding or understanding, and in some instances, gave outright contradictory testimony, and in some cases, failed to answer[]. The Court is taking this into consideration as I assess the evidence in the case, and I will, in fact, address some of those later as we go through the testimony.

The trial court awarded plaintiff sole legal and physical custody of DC and parenting time to defendant on alternating weekends and one weekday evening. The parties received alternating weeks with DC in the summer. The court calculated and entered two orders concerning child support. The trial court also agreed that spousal support was warranted in this case and awarded defendant $1,000 a month for three years.

This appeal followed.

---

[1] The court subsequently held an evidentiary hearing during which the parties testified; the trial court denied the request for temporary spousal support because it found that that temporary support was inappropriate given plaintiff's payment obligations regarding the parties' debt load and other financial obligations as well as defendant's age and ability to work.

## II. ANALYSIS

### A. STANDARD OF REVIEW

We apply three standards of review in custody cases. The great weight of the evidence standard applies to all findings of fact. A trial court's findings regarding the existence of an established custodial environment and regarding each custody factor should be affirmed unless the evidence clearly preponderates in the opposite direction. An abuse of discretion standard applies to the trial court's discretionary rulings such as custody decisions. Questions of law are reviewed for clear legal error. A trial court commits clear legal error when it incorrectly chooses, interprets, or applies the law. [*Thompson v Thompson*, 261 Mich App 353, 358; 683 NW2d 250 (2004) (quotation marks and citation omitted).]

The harmless-error rule, MCR 2.613(A), generally applies in civil proceedings. *In re Miller*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 364195); slip op at 5. "To overcome this rule, a party must show that an error was prejudicial such that a failure to grant relief would be inconsistent with substantial justice, i.e., that it is more likely than not the error affected the case's outcome." *Id*.

### B. TEMPORARY CUSTODY ORDER

First, defendant asserts that the trial court erred by awarding plaintiff primary physical custody in a temporary order without holding a hearing. Defendant is not entitled to relief because the court made factual findings concerning the established custodial environment and the child's best interests before issuing its final custody order in the divorce judgment.

This appeal concerns a child custody dispute under the Child Custody Act, MCL 722.21 *et seq*. Specifically, MCL 722.27 addresses the trial court's authority to issue an order involving custody. In pertinent part, MCL 722.27 provides, in pertinent part, the following:

> (1) If a child custody dispute has been submitted to the circuit court as an original action under this act or has arisen incidentally from another action in the circuit court or an order or judgment of the circuit court, for the best interests of the child the court may do 1 or more of the following:

> \* \* \*

> (c) Subject to subsection (3), modify or amend its previous judgments or orders for proper cause shown or because of change of circumstances until the child reaches 18 years of age and, subject to section 5b of the support and parenting time enforcement act, 1982 PA 295, MCL 552.605b, until the child reaches 19 years and 6 months of age. The court shall not *modify or amend* its previous judgments or orders or *issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the*

*best interest of the child.* The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered. If a motion for change of custody is filed while a parent is active duty, the court shall not consider a parent's absence due to that active duty status in a best interest of the child determination. [Emphasis added.]

This Court has explained that "[a]n established custodial environment is one of significant duration in which a parent provides care, discipline, love, guidance, and attention that is appropriate to the age and individual needs of the child." *Berger v Berger*, 277 Mich App 700, 706; 747 NW2d 336 (2008). "It is both a physical and a psychological environment that fosters a relationship between custodian and child and is marked by security, stability, and permanence." *Id.* "A custodial environment can be established as a result of a temporary custody order, in violation of a custody order, or in the absence of a custody order." *Id.* at 707. "An established custodial environment may exist with both parents where a child looks to both the mother and the father for guidance, discipline, the necessities of life, and parental comfort." *Id.* Determining whether a child has an established custodial environment with one or both parents "is an intense factual inquiry." *Bofysil v Bofysil*, 332 Mich App 232, 242; 956 NW2d 544 (2020) (quotation marks and citation omitted).

At the outset, defendant never challenged the trial court's temporary custody order on the basis that the trial court failed to hold an evidentiary hearing or consider the child's best interests. As a result, this claim is not preserved. See *Fast Air, Inc v Knight*, 235 Mich App 541, 549; 599 NW2d 489 (1999). Indeed, in civil cases, failure to timely raise an issue generally waives review of that issue on appeal. *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008); *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW2d ____ (2023) (Docket No. 359090); slip op at 3.

Notably, MCR 3.207(A) allows a trial court to issue "ex parte and temporary orders with regard to any matter within its jurisdiction . . . ." Indeed, MCR 3.207(C) provides, in pertinent part:

(1) A request for a temporary order may be made at any time during the pendency of the case by filing a verified motion that sets forth facts sufficient to support the relief requested.

(2) A temporary order may not be issued without a hearing, unless the parties agree otherwise or fail to file a written objection or motion as provided in

In this case, at the time that the trial court entered the temporary custody order, the parties were separated and had filed for divorce, and there were no existing orders pertaining to custody. While the trial court properly considered the verified motion and conducted a hearing on plaintiff's motion for temporary order pursuant to MCR 3.207(C), it made no specific findings on the record regarding whether either party had an established custodial environment at that time. This Court has observed that,

In light of the clear intention of the Legislature, the first sentence of the MCL 722.27(1)(c) does not apply [to] the trial court's initial or 'new' custody order in this matter. The trial court's award of custody was not a modification or amendment; it was a new order that is only subject to the limitation provided in the second sentence of MCL 722.27(1)(c). As such, the requirement to show proper cause or change of circumstances does not apply to the trial court's initial award of custody in the present case. *Thompson*, 261 Mich App at 361-362.

According to the second sentence of MCL 722.27(1)(c), the court "shall not modify or amend its previous judgments or orders or issue a *new order* so as *to change* the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." [Emphasis added.] The trial court's temporary order was the first order in the case. While the trial court did not make any explicit findings on the record, the temporary custody order arguably did not change DC's established custodial environment. Indeed, the trial court entered its December 14, 2021 temporary order and scheduled an evidentiary hearing regarding custody, support and parenting time and reserved the issue of spousal support. At the end of the divorce trial, the court made findings concerning DC's established custodial environment and the child's best interests. The trial court's determination regarding DC's established custodial environment revealed that plaintiff had and maintained DC's established custodial environment. The young child went to plaintiff when hurt or in need, while defendant could not always understand the child and could not hear him cry at night due to a congenital hearing issue, that plaintiff took care of DC's medical and educational needs, and that she worked from home while living with her parent; comparatively, defendant was seeking his commercial driver's license (CDL) and would be traveling for work, he was the primary care giver three days a week after plaintiff's maternity leave ended and before she started working from home in September 2019, and that both parties would prepare meals because they preferred different foods. While the trial court found the parties' situation to be "fluid," it did find "by the time that this action was filed, that the Court will find that the established custodial environment in this matter does exist and did exist with the Plaintiff, Mother." Accordingly, the trial court did not *alter* the child's established custodial environment when it entered the temporary order, and it complied with the proper statutory framework in a child custody dispute. See *Thompson, supra*.

Defendant also challenges the trial court's determination concerning the established custodial environment and argues that the court erred by not considering the circumstances that existed at the time it made its ruling on February 14, 2023. The trial court considered MCL 722.27(1)(c)'s mandate that an established custodial environment is established "over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered." The trial court considered these factors and credited plaintiff's testimony that was responsible for 90% of the potty training, was primarily responsible for getting the child to sleep and handling the overnight care, and that she was able to care for him while working from home since September 2019. The court understood that defendant cared for DC when plaintiff was working away from home but that defendant had a hard time understanding what DC wanted. Clearly, the trial court did consider DC's established custodial environment at both the start of the case and its conclusion. We find that the evidence does not clearly preponderate in the opposite direction. See *Thompson,* 261 Mich App at 358.

## C. CHILD CUSTODY

Next, defendant argues that the trial court erred by awarding plaintiff sole legal and physical custody, while only allowing him to have limited parenting time. We disagree.

Because the trial court concluded that the established custodial environment existed with plaintiff and defendant's request for shared legal and physical custody would presumably alter that established custodial environment, defendant was required to show that the proposed custody change would be DC's best interests by clear and convincing evidence. "If a proposed change would modify the child's established custodial environment, the proponent must demonstrate by clear and convincing evidence that the proposed change is in the child's best interests." *Bofysil*, 332 Mich App at 243. On the other hand, "[i]f the proposed change would not modify the established custodial environment, the proponent need only demonstrate by a preponderance of the evidence that the proposed change is in the child's best interests." *Id*.

Defendant asserts that the trial court's findings concerning the best-interest factors were erroneous. We disagree.

We review a trial court's discretionary ruling such as a custody decision for an abuse of discretion. *Thompson*, 261 Mich App at 358. Because the trial court's findings of fact regarding each custody factor are reviewed according to the great weight of the evidence standard, they should be affirmed unless "the evidence clearly preponderates in the opposite direction." *Id.* "[C]ustody disputes are to be resolved in the child's best interests, and [g]enerally, a trial court determines the best interests of the child by weighing the twelve statutory factors outlined in MCL 722.23." *Demski v Petlick*, 309 Mich App 404, 446; 873 NW2d 596 (2015) (quotation marks and citation omitted; alterations in original).

MCL 722.23 contains the following best interest factors:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute.

"In addition, the court must consider the general level of cooperation and agreement between the parties when considering joint custody." *Dailey v Kloenhamer*, 291 Mich App 660, 667; 811 NW2d 501 (2011) (quotations marks and citation omitted). "When ruling on a custody motion, the circuit court must expressly evaluate each best-interest factor and state its reasons for granting or denying the custody request on the record." *Id*.

In this case, the trial court concluded that Factors (a), (d), (e), (f), (g), (h), and (j) favored both parties equally. The court did not consider Factors (i) or (k). The court opined that Factors (b) and (c) slightly favored plaintiff. In regard to Factor (*l*), the trial court determined that the parties were unable to effectively coparent and share legal custody. Defendant specifically objects to the trial court's findings for Factors (b), (c), and (*l*). Accordingly, we will focus on those factors.

Factor (b) focuses on the capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any. The trial court found that this factor slightly favored plaintiff. The court explained that plaintiff took DC to church and read him bible stories. After moving to be closer to family and school options, plaintiff also investigated various preschools for DC to attend. Defendant would not agree to the preschool she picked because he needed more information. He failed, however, to obtain any additional information. He required plaintiff to provide all the information concerning schools. Plaintiff was also the one who stayed home with DC when he was sick.

The trial court's findings under Factor (b) were not against the great weight of the evidence. Defendant argues that DC's church attendance had little relevance to custody and that plaintiff did not attend church until she left the marital home and initiated the divorce action. Although the court considered plaintiff's church attendance with DC and stated that plaintiff believed bible stories provided the child with examples of morality and integrity, it also considered that plaintiff investigated and enrolled DC in preschool, while defendant took no steps toward DC's early

education. Considering all the evidence presented at trial, the trial court did not err by concluding that this factor slightly favored plaintiff.

Factor (c) is the capacity and disposition of the parties involved to provide the child with food, clothing, medical care, or other remedial care. The trial court also found that this factor slightly favored plaintiff. According to the trial court, both parties were working and were able to provide for DC's material needs. The court also observed that defendant did not make any financial contributions toward the child until May 2022. The court recounted defendant's belief that he should not be required to reimburse plaintiff for any uninsured medical expenses because "she was the primary breadwinner." Both parties provided health insurance for DC after defendant went back to work. The court concluded that defendant apparently could and did provide food and clothing to DC as well. It also found that plaintiff was responsible for, initiated, and pursued all DC's medical and dentist appointments, bought his clothing, and obtained a cooling vest to remediate his medical condition.[2] She also cooked in the evening because defendant was rarely home. Defendant was also able to prepare meals for DC but the testimony revealed that he was often out "doing his own thing." Defendant testified that plaintiff scheduled the appointments when he was unavailable or did not inform him, but the court concluded that plaintiff was the primary parent responsible for DC's medical care.

Defendant has not shown that these findings of fact were against the great weight of the evidence. *Thompson*, 261 Mich App at 358. He argues that the trial court should have considered the fact that he only started paying child support in May 2022 after he was employed. Defendant believed he was negatively impacted by the court's refusal to grant his request for spousal support at the outset of the case, the parties' history of him being the stay-home parent, and the difficulty anyone would have transiting to full-time employment after being out of the workforce for several years. Defendant further asserts that the court failed to consider these mitigating factors as well as testimony that he cared for the child and that plaintiff would make medical appointments without notifying him.

The court did not focus on defendant's failure to provide child support before he was employed but it did note that defendant "did not believe that he should reimburse Plaintiff for the uninsur[ed] medical because she was the primary breadwinner.". Rather, the court focused on the fact that plaintiff initiated most of DC's medical care. Both of the parties testified that plaintiff typically made DC's medical and dental appointments. The testimony also indicated that plaintiff was mostly involved in the diagnosis and treatment of DC's anhidrosis, such as making appointments for testing and obtaining the cooling vest. The parties continue to dispute the existence and severity of this condition; however, the evidence showed that plaintiff was the most involved with DC's medical care. For instance, defendant insisted that they obtain a second

---

[2] DC was diagnosed with anhidrosis, a rare condition involving the inability to sweat or regulate his body temperature. Plaintiff obtained a cooling vest to help regulate DC's body temperature when he did outside activities. Plaintiff testified that if his condition was not taken seriously, he could overheat and suffer heat stroke, which is often fatal in toddlers..

opinion regarding DC's condition, but he waited several weeks to make an appointment.[3] Ultimately, there was sufficient evidence in the record for the trial court to find that this factor slightly favored plaintiff, and the great weight of the evidence supports this finding.

Finally, Factor (*l*) includes any other factor that the trial court considers to be relevant to a particular child custody dispute. The trial court stated that the parties had to be advised of the possibility of joint custody and the court had to consider joint custody per MCL 722.26a(1). The court concluded that the parties could not effectively share legal custody of DC, noting that the parties were unable to agree or discuss important matters concerning DC's medical treatment, schooling or religious upbringing. The trial court, citing *Shulick v Richards*, 273 Mich App 320, 326; 729 NW2d 533 (2006), stated, "If the parties cannot agree on essential decisions, sole custody must—or cannot agree or discuss issues—essential issues, sole custody shall be awarded."

The court observed that defendant did not like DC attending church, but he did not research the church. He refused to download the suggested communication application and would not use Our Family Wizard. Plaintiff wanted defendant to comply with the cooling precautions DC's doctors recommended, but defendant did not take it seriously. The trial court did not find defendant's reasons for failing to cooperate with plaintiff very credible. According to the court,

> [Defendant] doesn't believe that he was involved in the decisions, and as a result, has either resentment or something else in that particular matter, but all of the testimony does convince this Court that the parties cannot communicate about important decisions, and as a result, the Court is going to grant sole legal custody to [plaintiff].

Defendant asserts that the trial court's finding that the parties were unable to communicate concerning major decisions affecting DC's welfare did not justify an award of sole legal custody to plaintiff. However, "in determining whether joint legal custody is in the best interests of the child, the court must consider [w]hether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child." *Bofysil*, 332 Mich App at 249 (quotation marks and citation omitted; alteration in original).

> In order for joint custody to work, parents must be able to agree with each other on basic issues in child rearing—including health care, religion, education, day to day decision-making and discipline—and they must be willing to cooperate with each other in joint decision-making. If two equally capable parents whose marriage relationship has irreconcilably broken down are unable to cooperate and to agree generally concerning important decisions affecting the welfare of their children, the court has no alternative but to determine which parent shall have sole custody of the children. [*Id*. (quotation marks and citation omitted).]

---

[3] The trial court hoped that the second opinion, when eventually received, would resolve the parties' disagreements regarding DC's medical diagnosis.

In this case, there was abundant evidence to support the trial court's conclusion that the parties could not agree on important decisions affecting DC. The parties could not agree on the school that DC would attend, whether he should attend church, or the proper treatment for his medical condition. Indeed, the parties could not come to an agreement regarding which communication application to use. There was no indication that these disputes would cease following the entry of the divorce judgment. Again, these findings were supported by the extensive evidence adduced at trial. See *Thompson*, 261 Mich App at 358.

Defendant additionally argues that, given plaintiff's history of frequent moves, the trial court should have considered whether granting her sole legal custody made it more likely for her to move farther away. The record evidence does not support this conclusion. Plaintiff purchased a home in Battle Creek that was near her parents and where she wanted DC to attend school. Since the fall of 2019, plaintiff worked remotely, and it appears that she plans to remain employed with that same company. There was no evidence presented that plaintiff planned to move, so this consideration did not impact the trial court's final determination.

Defendant also challenges how the trial court calculated his parenting time in the divorce judgment. According to MCL 722.27a(7),

> The court may consider the following factors when determining the frequency, duration, and type of parenting time to be granted:
>
> (a) The existence of any special circumstances or needs of the child.
>
> (b) Whether the child is a nursing child less than 6 months of age, or less than 1 year of age if the child receives substantial nutrition through nursing.
>
> (c) The reasonable likelihood of abuse or neglect of the child during parenting time.
>
> (d) The reasonable likelihood of abuse of a parent resulting from the exercise of parenting time.
>
> (e) The inconvenience to, and burdensome impact or effect on, the child of traveling for purposes of parenting time.
>
> (f) Whether a parent can reasonably be expected to exercise parenting time in accordance with the court order.
>
> (g) Whether a parent has frequently failed to exercise reasonable parenting time.
>
> (h) The threatened or actual detention of the child with the intent to retain or conceal the child from the other parent or from a third person who has legal custody. A custodial parent's temporary residence with the child in a domestic violence shelter shall not be construed as evidence of the custodial parent's intent to retain or conceal the child from the other parent.

(i) Any other relevant factors.

In this case, the trial court found that Factors (b), (c), (d), and (h) were either inapplicable or not likely to occur. As for Factor (a), the existence of any special circumstances or needs of the child, the trial court referred to DC's anhidrosis diagnosis. The court hoped that defendant would take the diagnosis seriously if it were confirmed by the second opinion. As for Factor (e), the inconvenience to the child for having to travel for parenting time, the court did not believe that there would be any impact on the child because the parties lived a short distance apart. Factors (f) and (g) talk about whether a parent will exercise parenting time pursuant to court order or has frequently failed to exercise reasonable parenting time, respectively. The court stated that defendant has not failed to exercise parenting time and was likely to exercise his parenting time. Regarding Factor (i), the trial court considered defendant's summer work schedule during which he had Fridays off.

Accordingly, the trial court granted defendant parenting time on alternating weekends from Thursday at 6:00 p.m. until Sunday at 6:00 p.m., with a midweek day on Tuesdays from 4:00 p.m. until 8:00 p.m. unless the parties agree otherwise. Defendant would also have parenting time on alternating weeks in the summer and on alternating holidays.

Defendant does not challenge the trial court's specific findings as to the parenting-time factors. Rather, he appears to challenge the overall amount of parenting time that he was awarded under the judgment of divorce. See *1031 Lapeer LLC v Rice*, 290 Mich App 225, 233-234; 810 NW2d 293 (2010) (stating that an appellant may not "simply announce a position or assert an error and then leave it to this Court to discover and rationalize the basis for the appellant's claims, unravel and elaborate upon the arguments, and search for the authority to support his or her position"). In any event, we do not believe that the trial court's parenting-time calculation was an abuse of discretion. To the extent defendant argues that the trial court erred by taking away his overnights on Thursdays, the court initially allowed defendant to have parenting time overnight on Thursday evenings because he did not have to work on Fridays during the summer. The parenting-time schedule reverted to the normal schedule in the fall, however, when defendant was no longer working his summer schedule. Under the final custody order, defendant also has parenting time on Thursday nights on alternating weekends and full weeks in the summer on an alternating basis. Accordingly, the trial court did not abuse its discretion when it crafted defendant's parenting-time schedule. See *Thompson*, 261 Mich App at 358.

## D. CHILD SUPPORT

Defendant further asserts that the trial court erred in its calculation of child support. We disagree.

"Generally, child support orders, including orders modifying child support, are reviewed for an abuse of discretion." *Clarke v Clarke*, 297 Mich App 172, 178-179; 823 NW2d 318 (2012). "[W]hether the trial court properly applied the [Michigan Child Support Formula] presents a question of law that we review de novo." *Id*. at 179. "On the other hand, factual findings underlying the trial court's decisions are reviewed for clear error." *Id*.

"Child support is for the benefit of the child, and it is important to protect children against disruptions in child support payments." *Fisher v Fisher*, 276 Mich App 424, 429; 741 NW2d 68 (2007).

> The Michigan Legislature has required that when a court orders child support as part of a divorce judgment, the court shall order child support in an amount determined by application of the child support formula developed by the state friend of the court bureau unless to do so would be unjust or inappropriate and the trial court makes certain specified findings in writing or on the record . . . . [*Stallworth v Stallworth*, 275 Mich App 282, 283-284; 738 NW2d 264 (2007) (quotation marks and citation omitted; ellipsis in original).]

"[T]he first step in determining a child support award is to ascertain each parent's net income by considering all sources of income." *Id*. "In general, this is determined by ascertaining the actual resources of each parent." *Id*. (quotations and citation omitted).

In addition, "the general rule is that the protection of children mandates the finality of child support obligations and child support payments." *Fisher*, 276 Mich App at 429. MCL 552.603(2) provides:

> Except as otherwise provided in this section, a support order that is part of a judgment or is an order in a domestic relations matter is a judgment on and after the date the support amount is due as prescribed in section 5c, with the full force, effect, and attributes of a judgment of this state, and is not, on and after the date it is due, subject to retroactive modification. No additional action is necessary to reduce support to a final judgment. Retroactive modification of a support payment due under a support order is permissible with respect to a period during which there is pending a petition for modification, but only from the date that notice of the petition was given to the payer or recipient of support.

At the outset, plaintiff asserts that defendant's challenges to the child support calculation are moot because the trial court scheduled a hearing concerning defendant's motion to modify child support. We are not aware of the outcome of that motion. At any rate, this Court is permitted to review the trial court's factual findings underlying the support award and the application of the child support formula. See *Clarke*, 297 Mich App at 178-179.

First, defendant challenges the child support award on the basis that plaintiff's income was incorrectly calculated because it did not include the $24,000 bonus that she received in 2022. At the July 11, 2022 hearing concerning defendant's objection to the proposed child support order, the court found it appropriate to consider the bonus that plaintiff already received; therefore, her attributed income would be $154,284. The temporary child support order reflects the trial court's ruling. In the judgment of divorce, however, plaintiff's income was listed as $122,947 pursuant to her "2021 income" for purposes of calculating child support. At the hearing concerning entry of the divorce judgment, defendant objected to the amount attributed to plaintiff's income because it did not include her 2022 bonus. The trial court explained that it did not have any documentary evidence of plaintiff's 2022 income; there was testimony at trial concerning the bonus, but no

testimony related to plaintiff's 2022 income. As a result, the court used plaintiff's 2021 income in the child support calculation. The court explained that it would consider a modification if plaintiff's 2022 W-2 was presented.

Under these circumstances, the trial court did not err by using plaintiff's 2021 income to calculate child support in the judgment of divorce. The court relied on the documentary evidence and testimony that was provided at trial and invited the parties to seek modification of the award if additional evidence became available. It appears that defendant has sought modification on the basis of plaintiff's 2022 income, and it is possible that this dispute has been resolved. Also, it was not guaranteed that plaintiff would receive the same income plus bonus in the future, and the court did not err in basing child support going forward on plaintiff's base salary—the only base salary placed into evidence.[4] Therefore, we find no clear error that would entitle defendant to a reversal of the child support order based on the record evidence currently available to this Court.

Second, defendant argues that the trial court erred by including childcare expenses in the support order without having made any specific findings concerning childcare costs. In the child support order, defendant is responsible for $256 a month in childcare costs. The order further showed that plaintiff was listed as paying $800 a month for childcare. Defendant never raised any claim concerning childcare costs in the trial court, and the evidence of such costs was limited during the proceedings. Despite this waiver, we will briefly address the merits of the issue. See *Walters*, 481 Mich at 387; *Tolas Oil & Gas Exploration Co*, ___ Mich App at ___; slip op at 3.

Plaintiff presented documentation showing her childcare costs. In an exhibit attached to her response to defendant's objection to the temporary child support order, it shows she paid "childcare costs in the amount of $670 per month, as follows: **Summer $400 x 3 months and School year $760 x 9 months** . . . ." She further stated that her childcare costs would increase to $850 a month in the fall of 2022. Plaintiff also attached two exhibits showing the tuition and fees for summer and the school year at the preschool DC attended.

In pertinent part, the Michigan Child Support Formula, 2021 MCSF 3.06(A) states:

> Based on each parent's percentage share of family income, allocate the actual child care expenses for the children in the case under consideration which allow a parent or nonparent-custodian to look for employment, retain employment, or to attend an educational program to improve employment opportunities.
>
> (1) When custodians or parents have an established child care pattern and can verify that they have actual, predictable and reasonable child care expenses, use the actual costs in the calculation.

---

[4] Notably, defendant's child support obligation decreased from the temporary order ($748 per month with plaintiff's income at $154,284) to the judgment of divorce ($729 per month with plaintiff's income at $122,947).

Because plaintiff submitted documentary evidence of her childcare expenses and defendant failed to present any objection, the trial court properly used the actual costs in the child support calculation.

Third, defendant argues that the trial court erred by including the value of his housing in his income. According to the Michigan Child Support Formula, 2021 MCSF 2.01(D), in pertinent part,

> Income also includes the market value of perquisites (perks) received as goods, services, or other noncash benefit for which the parent did not pay, if they reduce personal expenses, and have significant value or are received regularly.
>
> (1) Common forms of perquisites (perks) or goods and services received in-kind include, but are not limited to: housing, meals, or room and board, personal use of a company business vehicle or mileage reimbursement, including use between home and primary worksite, and other goods or services.

In this case, defendant testified at the May 19, 2022 bench trial that he was living at the guesthouse on a friend's property. He said that his friend offered to let him live in a newly-constructed guesthouse on Duck Lake above the garage; it was 1,500 square feet with two bedrooms and one bathroom. Defendant explained that he did work around the property, such as mowing and painting, to live there. Defendant testified that there was no written lease and he engaged in "handyman activities" to work off the rent. He estimated that he was providing about $900 in services to live at the guesthouse. On December 6, 2022, however, defendant testified that he signed a rental least for the same property on July 1, 2022 and paid $300 per month in rent. When asked about the trial court's decision to impute income of $900 a month to him as a perk, defendant changed course:

> No, I never bartered for any room and board, I've never been paid for any work around the place to give me any extra cash or anything like that. There was never an agreement about bartering for services or doing services so I could stay there."

Although defendant tried to dispute this testimony, the trial court did not find defendant's testimony credible. "This Court gives special deference to a trial court's findings when they are based on the credibility of the witnesses." *Draggoo v Draggoo*, 223 Mich App 415, 429; 566 NW2d 642 (1997). Accordingly, the trial court did not err by including the purported value of defendant's housing in his income for purposes of calculating child support, and we find no abuse of discretion in the calculation of the child support order. *Clark,* 297 Mich App at 178-179.

E. SPOUSAL SUPPORT

Finally, defendant asserts that the trial court erred by denying his request for temporary spousal support during the divorce proceedings and in the calculation of the final support award following trial. We disagree.

"It is within the trial court's discretion to award spousal support, and we review a spousal support award for an abuse of discretion." *Loutts v Loutts*, 298 Mich App 21, 25; 826 NW2d 152

(2012). "The object in awarding spousal support is to balance the incomes and needs of the parties so that neither will be impoverished; spousal support is to be based on what is just and reasonable under the circumstances of the case." *Id*. at 26. This Court reviews "for clear error the trial court's factual findings regarding spousal support." *Id*. "If the trial court's findings are not clearly erroneous, we must determine whether the dispositional ruling was fair and equitable under the circumstances of the case." *Id*.

A court should consider the following factors to determine whether to award spousal support:

> (1) the past relations and conduct of the parties, (2) the length of the marriage, (3) the abilities of the parties to work, (4) the source and amount of property awarded to the parties, (5) the parties' ages, (6) the abilities of the parties to pay alimony, (7) the present situation of the parties, (8) the needs of the parties, (9) the parties' health, (10) the prior standard of living of the parties and whether either is responsible for the support of others, (11) contributions of the parties to the joint estate, (12) a party's fault in causing the divorce, (13) the effect of cohabitation on a party's financial status, and (14) general principles of equity. [*Olson v Olson*, 256 Mich App 619, 631; 671 NW 2d 619 (2003).]

The trial court held an evidentiary hearing on February 3, 2022 concerning defendant's request for a temporary spousal support. After the parties testified, the trial court considered the appropriate factors outlined in *Olson*.[5] Ultimately, the trial court focused on the parties' ability to work and plaintiff's ability to pay. The trial court believed that both parties had the ability to work. Plaintiff was working at the time, and she had been the primary source of income for the parties during the marriage. Defendant testified that he was currently enrolled in CDL training. He had one week of class left, and his plan was to apply for a job with the state of Michigan as a truck driver. In terms of plaintiff's ability to pay, the trial court noted that plaintiff was making monthly payments towards the parties' substantial debt load. Plaintiff presented her budget showing that her monthly expenses were more than her net income. Ultimately, the trial court concluded that defendant had good prospects for employment and that he would be able to pay his expenses after he acquired that employment. On the other hand, plaintiff was unable to pay spousal support because of her financial obligations paying the joint marital debt.

The trial court's conclusion to deny temporary spousal support was supported by the evidence and appeared fair and equitable under the circumstances in this case. The trial court considered the necessary factors and concluded that defendant had the ability to obtain employment to pay his expenses, while plaintiff did not have the ability to pay spousal support because she was making monthly payments toward the parties' marital debt. Accordingly, the trial

---

[5] Defendant does not challenge the trial court's findings concerning any of those factors, but challenges the denial of interim spousal support and the impact of the court effectively requiring defendant to access an "early-divided bank account in lieu of spousal support." In its February 3, 2022 bench opinion denying interim spousal support, the trial court only reflected on the fact that defendant chose to spend his half of the account, not that the account was in lieu of support.

court's denial of defendant's request for temporary spousal support was not an abuse of discretion. See *Berger*, 277 Mich App at 727.

Additionally, the trial court's ultimate award of $1,000 in spousal support was also not an abuse of discretion. The trial court again considered the appropriate factors, including the parties' present situation, and concluded that transitional spousal support was warranted in the amount of $1,000 a month for three years. The trial court acknowledged the disparity in the parties' annual incomes: plaintiff's income was approximately $123,000, while defendant's income was $43,000. The court further considered the amount of the parties' debt and defendant's monthly budget. It appears that the three-year duration of spousal support was meant to assist defendant as he transitioned into full-time membership in the workforce. The spousal support "award was just and reasonable under the circumstances of the case." *Id.*

Defendant further argues that the trial court erred by making the child support payments retroactive, but not making the spousal support payment retroactive. The Uniform Child Support Order was originally entered on July 25, 2022 and was modified to reflect an amended date of April 1, 2022 pursuant to the trial court's rulings on May 1, 2023; that UCSO established defendant's child support payments at $748 per month. After trial, a February 14, 2023 UCSO lowered defendant's child support to $729 per month. Defendant signified his agreement to these UCSO's by signing them. On the other hand, the spousal support payments were effective on the day the judgment of divorce entered—May 1, 2023—and defendant again signed the Uniform Spousal Support Order. Defendant requested interim spousal support and that request was denied in February 2022. The trial court properly considered the appropriate factors in deciding whether to award spousal support, which defendant does not challenge on appeal.[6] Nonetheless, we find there was no error considering that plaintiff successfully requested temporary child support while the proceedings were ongoing, while defendant's request for temporary spousal support was unsuccessful. As previously stated, "[c]hild support is for the benefit of the child, and it is important to protect children against disruptions in child support payments." *Fisher*, 276 Mich App at 429. Accordingly, the court did not err by making the spousal support payments prospective.

Finally, defendant appears to argue that the trial court erred by requiring him to reimburse plaintiff $12,556 for payments that she made toward the marital debt during the proceedings. As of December 2022, plaintiff's documentation showed that she paid a total of $30,162 toward marital debt. The trial court attributed $25,112 for the amount that plaintiff paid toward marital debt and ordered that defendant reimburse her for half of that amount—$12,556. Plaintiff was further ordered to be responsible for paying the debts in her name, which amounted to $91,654.16, while defendant was responsible for paying debts in his name in the amount of $15,798. "The goal is distributing marital assets in a divorce proceeding is to reach an equitable distribution in light of all the circumstances." *Berger*, 277 Mich App at 716-717. Considering the evidence

---

[6] In its Statement of Issues Presented, defendant also argues that the trial court erred in denying interim attorney fees but did not argue that point in its brief; in fact, the trial court granted defendant $5,000.00 in attorney fees at the end of trial.

presented in this case, the trial court's property and debt distribution was not improper.

Affirmed.

/s/ Sima G. Patel
/s/ Michelle M. Rick
/s/ Kathleen A. Feeney